Next case on the calendar is Barlow v. Washington Mr. Talmadge, you can proceed when you're ready. Thank you. May it please the Court, Phil Talmadge here representing Madeleine Barlow. Ms. Barlow was an incoming Washington State University freshman who was raped in Pullman, Washington by Thomas Culhane, an upperclassman with a history of sexual misconduct. While he was theoretically under Washington State University's supervision for prior sexual misconduct at its Vancouver, Washington campus, Washington State, WSU, I'm going to use that acronym, was aware of Mr. Culhane's prior violations of its sexual misconduct policy in Vancouver. Nevertheless, it permitted him to transfer to its Pullman campus. Can I, let me ask you a question at the outset. Yes, Your Honor. Let's assume for a moment that there's a duty of some kind. Yes. Which I think is a question we might want to ask somebody else to answer. Yes. Clearly under Title IX and State Common Law. Well, okay. I'm just, I'm worried only about State Common Law for the moment. Sure. I'm trying to, I'm reading your brief and trying to figure out how you think that duty was breached. In other words, are you contending that it was breached because they didn't warn Ms. Barlow of this gentleman's prior problems? Are you contending that it was breached because they allowed him to transfer? Or are you contending that it was breached in some other way? We contend it was breached because he was allowed to transfer without supervision to the Pullman campus. Let's not lose sight of the fact. All of the sexual misconduct- I want to be clear. You're not claiming that they had some duty to warn students about this person? No. I think the argument here is that they had a duty to supervise him appropriately. The question was- And the breach of that duty, in your view, was allowing him to transfer. Right. I mean, this was a- I thought you just said it was allowing him to transfer without, quote, supervision. That's correct. And earlier you had said he was under supervision. Is that referring to the sanctions imposed on August 1? The nine-day suspension and the research paper and so on? That's correct, Your Honor. What we're getting at was he was not under any specific- Any specific person at the Pullman campus of Washington State University was charged with responsibility of keeping an eye on this guy. Somebody- Was somebody charged with responsibility at the Vancouver campus? Well, I think they had a- In theory, they did. They had- You know, Washington State University had two separate entities that were involved here. They had OEO and OSC. The OSC people were the people that did the supervision of the individual. The OEO people were the people that did the investigation. And the OSC people, in theory, supervised this individual. See, that's what I'm trying- Go ahead, Judge Boggs. By supervision, I just want to be clear. Do you mean- I mean, you know, for criminals, we talk about how people under supervision, they have a parole officer, so on. Correct. I asked you, the, quote, sanctions imposed were a suspension, a dependency assessment, and he was supposed to write a research paper. Was there anything else that you call supervision? Alcohol treatment, which he didn't get. Well, I said alcohol assessment. Is that different from treatment? Yeah, that was- No, that was it. Okay. He was supposed to have it and didn't have it. And that didn't happen- I mean, it's a fairly short time frame here, right? The sanctions were imposed in August 1, and this is three weeks later. So is that part of the evil? That's independent of the transfer. Well, he has- I mean, do you mean that he should have been required to get some signatures or check some boxes before he transferred? Well, we don't believe he should have transferred at all. Okay. Well, that's why I asked. I think we made that clear. And that's why I'm asking the same question. Yeah. So let me phrase it a little differently. Yeah. It's simply not a transfer. Was he under appropriate supervision, in your view, while on the Vancouver campus? We don't think it was sufficient. I mean, we don't think it was sufficiently serious in terms of the supervision for his past conduct. Okay. So it strikes me that your real complaint is about the absence of supervision, not about- I mean, the transfer, of course, was the but-for cause of your client's injury. But had he been under appropriate supervision at Pullman, would you have a complaint? Would we have a claim? Would you have a breach of duty? Well- Let's assume that they had imposed- forget what appropriate supervision is. Right. They'd imposed appropriate supervision over him at Pullman, and he nonetheless went out and committed this offense. Would there be a breach of duty? Well, I think allowing him to transfer was the predicate. Yeah. That's why I'm having trouble focusing on the- Yeah. I understand. The allowing to transfer may have increased the risk to your client because she happened to be there. And everybody- But it doesn't- Everybody else situated similarly. Well, but it doesn't strike me as a breach of the duty. The duty must be, in your view, that they didn't supervise him sufficiently knowing that he had this prior record. That- I mean- And so that's why I'm having difficulty focusing on the transfer as the breach of the duty, but rather something they didn't do with his student once he transferred to a different campus. It's akin to the NL case. If we're talking about Washington state law, your honor, the state common law theory, you have the sexual predator that's on the campus, another young woman participating in athletics. He takes her off campus and rapes her. It's a similar kind of circumstance that you have the special relationship, you have the off-campus set of circumstances, you have the obligation on the part of the school district to have done better. The difference with that case. That gets a different point, so let me ask you about it. Yeah. And I might add, in the NL case, your honor, the same kinds of questions were raised by the dissent in that case. But the Washington Supreme Court determined in that case that there was a viable special relationship and a cause of action that pertained for NL. Right. In the NL case, though, the offense, while it culminated off campus, began on campus. She was placed in danger on campus by the presence of this person who- Correct. Took her and did stuff. So my question is, what Washington case would I refer to that would find that the duty was extended off campus? In other words, in this case, the offense occurs entirely off campus. Well, but you have a set of circumstances that begin sometimes in the campus, but they- But there's no evidence in this case that he lured her from campus to an apartment or that he invited her to a- They were both together. So my question is not how you would argue it. My question is, is there a case that I can look at in California or in Washington or elsewhere that finds this special duty extends to protection of someone when off campus? Well, I think you look at cases like NL, I've already said, but Myers, the very recent decision of the Washington Supreme Court that students on an illicit off-campus excursion that was permitted by, you know, it was something that the teacher undertook without permission from appropriate authorities. But it was a- It started on campus. It was a school activity. Well, in theory, but all of the events took place off campus, way off campus. They go for a long walk, guy falls asleep and plows into the students who were on the wrong side of the street. That's a school activity, right? Well, it was not a school activity because in that case, the teacher didn't get appropriate permission from the parents or from the authorities. Let me, let me ask the question because you're good. Let me ask the question more specifically so I can just find out, because I've been looking for cases. I can't find any and I assume you've all been on the same search. I'm trying to find a case where a university is found to have reached a duty to someone for an injury that occurred entirely off campus and not in a either sanctioned or activity that the university or the school itself was conducting. Well- Is there any? I think you have to look at Simpson. You have to think about a case like Simpson where you have the football players going on a, you know, you're partying these, these prospective football recruits off campus. But that's, that's a, that's a campus-sponsored activity. Well sort of. I mean the, the- Here you'll agree this party was not a campus-sponsored activity. Well it wasn't, but here you have a, you have a, you have a significant differentiating fact, Your Honor, and that is in this particular case, Washington State University's OSC argued to the administrative law judge, we have authority over this individual. We have a policy, Executive Policy 15, that applies to off-campus activities. We've got this guy for purposes of disciplining him. They argue that the administrative law judge obliges and finds in finding a fact 5.1, 5.5, 5.6, 5.7, yep, you do. So they are, in fact, trying to go behind the argument that they made, judicially estopped they should be. So you're saying that he's under supervision and therefore they're liable for whatever he did that they didn't stop? Or is it that the level of supervision was insufficient? What I'm getting at, Your Honor, I think was the question that Judge Hurwitz asked me about, you know, is there a circumstance involving off-campus activity? The differentiating factor here was the university itself argued that the conduct that occurred, the rape of Madeleine Barlow that took place, was something that was... For me, that doesn't do anything. Let's assume I'm a student who's never done anything wrong before and I murder Judge Boggs and the university says, I think I can suspend you for that. I mean, the fact that they can suspend me for off-campus activity doesn't necessarily mean they're responsible for my actions. Well, the university's arguing that they have no control for purposes of the Title IX. Well, no, they're really not. They're just... No control or control, I thought your argument was... No, I mean, they're arguing that there is no control for purposes of the Title IX elements. Okay, so... Well, but I thought I just heard you talking about all the things that they did supervise him. Indeed, that's our response to that argument. Their argument is disingenuous. Let me ask you the question slightly differently. What you're telling us this morning is that you think Washington law is clear and that we ought to rule in your favor. In your brief, you also say, well, maybe we should certify it. We've invited the court to certify it. Let me... I want to ask you about the invitation to certify. You didn't really ask the district court to certify. What you said to the district court was, if you're going to rule against me, certify. Why should we give you a second bite at the apple at certification? Well, I think that they did ask. I mean, it wasn't as detailed and as... Well, it was. I mean, I read the brief. It's basically, we think we win, but if you don't think we win... I'll concede that that's what they said. But I think this is an important issue of Washington state law. I mean, this special relationship issue for a variety of reasons. You've got ferment in the law. We know that to be true. You've got eminent courts, California, Massachusetts, other courts have said, you know, we don't know about this special relationship between students and universities. And you've got the change in the restatement. Restatement second to restatement third. Restatement section 40 seems to suggest that universities do have that special relationship. And Washington State University relies on a 27-year-old case that long predated, long predated the development of the law in Washington in cases like NL and Myers. When you're arguing to us about what Washington law says or doesn't say, what you're really arguing is that you think the Washington Supreme Court would break new ground in a case like this, aren't you? I think the Washington Supreme Court would probably adopt the restatement section, restatement third section 40, consisting of its past behavior. It has not as yet. So is it fair to say that in your view, although you can find strands in Washington law that support your position, Washington law is unsettled on this issue? I think it's sufficiently unsettled in merit certification. Yes, your honor. I know you wanted to save some time for rebuttal. I do. I'm not telling you to stop talking. No, but I do want to save your time for rebuttal and I thank you for the opportunity. May it please the court. My name is Brian Baker. I'm assistant attorney general and I represent Washington State University. Plaintiff Madeline Barlow's assault at the hands of Thomas Colhane is reprehensible. That's not being argued today. However, the law simply does not provide a university with the authority to affect or the liability for this criminal acts of a suspended student off campus. Let me give you a hypothetical. It's not the facts of this case, so you don't need to tell me it's not the facts of this case. Let's assume that this gentleman had committed more serious acts than he had in the past with respect to other students and the university nonetheless assigned him to a class together with this woman and in that class, he assaulted her. Would you say it had breached no duty to the woman? So under Title IX, I'm talking about Washington common law, Washington common law. So in if the facts were of Barlow, I just made up the facts so you don't get the facts are he's let's make it even worse. He's assaulted women in the past. They nonetheless assigned him to a class with this woman and he assaults her in the classroom. Those are all the facts of the case. Okay. Breach of duty by the university? Possibly because the university theoretically has a well, if you look at the Johnson case, which is the only case to talk in the Washington law, the only case that talks about a special relationship between a university and its student, it actually found a business invitee relationship in that case. So we start out with the notion that the university does have a duty of reasonable care under some circumstances to protect one student from harm at the hands of another student. Does it not? On campus. Okay. That's why I made it on campus. They control the space under this hypothetical. Correct, Your Honor. Okay. So isn't the real question in this case, whether or not that duty extends beyond the physical boundaries of the campus? So the question in this case is whether or not there is a duty between a university and its students, a protective duty, especially with regards to the relationship between this Barlow and the university, whether there's a protective duty that exists outside of the university campus, outside of the university building, and Washington law in the Johnson case has specifically said that there is not. Well, that's what I'm trying to focus on. There plainly is a duty between the student and Ms. Barlow in this case to act reasonably towards her to protect her from harm. You don't dispute that. When she's on campus. They can't have rabbit traps all over the campus. And now they say they had some information which should have led them to act differently. They may not have breached the duty. So I'm having difficulty starting out with the proposition that the university has no duty to Ms. Barlow to protect her from harm. The real question in this case, on the duty level, not the breach or proximate cause or not that duty extends to protecting her from harm from this individual off campus. So we have the Washington law, we have the Johnson case, and if we look at any of the cases cited by the appellant here that talk about a special duty, all of them are specifically limited to on-campus activity. Can you address the CJC case in that, because in the CJC case, which involved the, I think deacon, who the church had some warning about past misconduct or possible misconduct, and the court specifically addressed the issue that the bad acts all occurred off of church property and outside of any church activity. And the court said there can still be liability in this case, even though it goes beyond what we would conventionally call the scope of the duty, because the breach occurred when the church got the warning and did nothing, and still allowed this man to become a deacon and interact with other people in the church community. And essentially the breach occurred when the church allowed that contact, allowed him to continue in the church despite the warning. So even though the injury, all the bad acts occurred outside of, it was not in church property, nothing in, not in church activity. How does that affect this case? So it, just like the NL case and all of the other cases cited by appellant here to talk about the change of the Washington law since Johnson, those cases all involve minor children in the custody or control of the organization that's being sued. So the NL case, we're talking about a junior high student, and the court specifically said that the school district's authority and obligation had been substituted for the parents. And if you look at that line of cases, HBH, NL, all of these cases that deal with K-12, so minor children, they're talking about the custodial relationship and the substitution of the parents. That's something that was- Well, I don't think, and I could be wrong, but I don't think in CJC there was a finding that the church had custodial relationship with the children who were injured. There was a relationship, but not a custodial relationship. Right. But the Johnson case, Your Honor, specifically talks about the difference between minors and adults and the difference contextually of that relationship that exists. And that's why the CJC- Well, CJC is dealing with agents of the church, too. Yeah. Right? Right. You have two things. One is, is there a special relationship with the victim? And sometimes, as in CJC, it's a special relationship with the perpetrator. They put them in that position. Let me ask you about the off-campus distinction, because is it just the physicality in the sense that if the astronomy class, if they take all the astronomy students off to an academy and leave them up there all night and something happens, might they not be responsible, or at least potentially responsible? I think it would depend on the ambit of control that exists in that setting. Is facilitation perhaps a better word? Possibly. I mean, the question here is there seemed to be little control and little facilitation, but maybe that's a factual question for the Supreme Court. So if we look at this court's ruling in Brown, for example, it talks specifically about an argument that's made by the appellant. Brown v. Arizona came out earlier this year. It talks about the control prong. And it essentially says, to be faithful to Title IX in Davis, there must be something beyond student-focused disciplinary authority that renders the context- At least from my perspective, the arguments that you're making about control and stuff are fairly persuasive in the Title IX context. I'm worrying about the common law context. And that's why- So let's assume for just purposes of your argument that we're only talking about the Washington common law context. And what Judge Fogg's question gets to is something that the Barlow case talks about a little bit, which is that there has to be some university or school involvement in the activity. Even if it doesn't occur in the physical confines of the campus, we're only going to hold the school liable if there's some sort of school connection with the activity, if you will. Here we have an apartment complex that the school essentially says, this is a good place to live. We have a relationship with them. They'll report stuff to us. Does that effectively transform it for purposes of our analysis into a dormitory as if it would have been on campus? No, Your Honor. Just because the apartment complex in question advertises at football games or in their brief they talk about requires WASU student ID, there's no indication that the university had the ability, like it would in a dorm, to inspect rooms, to have someone walk through the rooms and make sure they knew what was going on, to walk through the common areas, to have resident advisors. All of these things go into the ability of the school to control the dorms, to impose limitations on when visitors can come in, et cetera. There's no evidence, and there's no evidence in the record or that exists that says that the university had any control over the apartment complex. It was owned by a private corporation, private interest. They rented to students completely outside of the Washington State University housing system. There's just no control. It's a private place. The university has no ability. It wasn't patrolled by the Washington State University police. That's not within their jurisdiction. In fact, the Pullman Police Department investigated this crime. So there's just no control. There's no connection there. So why shouldn't we at least certify this question? Go ahead, judge. Yes, I have a question. The university did have some control over Corrine, though, didn't they? While he was on investigation pending, and certainly when his findings were sustained against him and they placed him on suspension, they could have revoked his transfer, couldn't they? So, it's important, so the investigation was ongoing when he filed his change of campus form. As was discussed in the district court's order, a change of campus form is essentially a pro forma, you decide where you want to take classes. Stop there for a second because I want to, but is the approval in this case an approval that we've thought about whether you should transfer and you should, or is it just where you've made the choice that you're entitled to and we're just noting it for the record? I can't tell that from this case. The latter, your honor. So, one of the things that the district court properly focused on is the structure of the university. It's one university. It's one university and the students have the ability to choose where they- And I didn't mean to take you off of, judge. But, I mean, the university could have made a decision, though, that a student who has an investigation for sexual misconduct pending against them would not be permitted to transfer. So, I would argue that under the current federal regulations, that would be an illegal decision. So, current federal regulations state that a university isn't to take any action that's not a protective act for a victim without doing the proper adjudication. So, if they'd done the adjudication first, could they have prevented him from- I don't think that there's anything within Washington State University's, anything within the WAC that would allow them, it's really a question of whether or not he can go to the university or he can't go to the university. Whether he chooses to go to Pullman, whether he chooses to go to Vancouver Online, any of these things is within his ability as a student. I'm inclined to agree with that reading of the record, and that's why I was asking Mr. Talmadge, isn't the real complaint that no matter where he was on your campuses, you should have done more once you, at least once you completed the investigation, and it was completed before this incident occurred, right? So it was completed and he continued to be suspended. He was placed under some restrictions. He was suspended, he got off the suspension, he had a bunch of things that Judge Box talked about. My question is, putting aside the transfer, no matter where he was on your campus, why weren't you required to do more to protect other students from it? So it's, I think it's important to sort of understand the facts and the timeline of what happened here. Mr. Culhane was, every time, there were three complaints against Mr. Culhane, including Ms. Barlow's. Every time the university was confronted with information about Mr. Culhane, I think it's Well, and I'm not, I'm not asking you whether or not it's punishment of him on each of these occasions was right or wrong, whether they act disciplinary actions. I'm just asking you now with the knowledge that this is a person who has a problem, do they have some obligation no matter what campus he's on, whether he's transferred or not, to protect others, other students from him? So in order to have a breach, you obviously have to have a corresponding duty in order to decide whether or not. That's right. I'm using duty. I'm using obligation like duty. See, your contention below was they had no duty, and the judge bought that, and that's why we're here. And so my question is, is it really true that there's just absolutely no duty to protect other students from someone about whom you have knowledge? Again, under the Johnson case, which is binding authority on this court, regardless of how old it is, under the Johnson case, the court specifically recognized that there may be some sort of duty to people who are on campus to create a campus that is safe, right? But the second that we start talking about off-campus, there has to be some other duty that exists under these circumstances, and there's just not. I understand your argument correctly, under the reasoning of Johnson, because the duty hinged on the student being a business invitee. That is why the campus is a necessary element. But if, as Counsel Farlow argues, the law on the special relationship between a university and its students is unsettled, and there's a possibility that the Washington Supreme Court would revisit that issue, if there was a finding by the, a holding by the Washington Supreme Court that there can be a special relationship between a university and students, is the campus then necessarily a limiting factor? I'm not sure under those circumstances, but I would argue that the law in Washington is not unsettled. We have a case that's directly on point in Johnson. We have no case that even speaks to overturn or make any commentary on the university and its student, the relationship between a university and its student. In fact, the Washington Supreme Court this year reiterated the level that's required in order to establish a special protective relationship in the Turner case. In Turner, the Washington Supreme Court said that in order to establish a special protective relationship, the person must be helpless, totally dependent, or under the complete control of someone else for decisions relating to their safety. As a general rule, college students certainly aren't that, college students that are adults certainly aren't that. And in specific, there's no evidence that Ms. Barlow met that definition either. So that's the first question of duty. The second one about the take charge duty, which is the duty that exists for the relationship between the university and Mr. Colhane, that also, again, Washington law is pretty clear about what's required. So assuming we have, on the one hand, we don't have enough looking at the university's relationship with Colhane alone. We don't have enough necessarily looking at the university's relationship with Barlow alone. But I understand the plaintiff to be arguing, you have to look at then the combination of two. We don't have a case on point where a university has a relationship with both the third party bad actor and the victim. And we don't have a Washington case essentially addressing whether there's enough with the combination of the two. Do you know of a case that addresses that? So the Johnson case, I think, does address that because it specifically says there is no special relationship between a university and its students, simply because... But that wasn't addressing a case in which both the victim and the third party perpetrator were students of the university. No, but the holding is that there is no special relationship. And so in order to have one of those two special relationships, I think you have to look at the case law that specifically addresses if there's separate questions. Even if Johnson, if followed, would resolve this question, it's a Washington Court of Appeals opinion. They are like us, an inferior court. The other side says, given recent trends, we think the Washington Supreme Court would modify what its inferiors said 30 years ago in Johnson. There's certainly case law in other states that go past what Johnson did. Why shouldn't we... I mean, I was once a state Supreme Court justice and I always hated the federal courts making state law. So why shouldn't we certify this? So Your Honor, you don't have to make state law. You just have to follow Washington law. There's no... Of course, they're going to argue that things that happened between Johnson and now have changed that. But if you look at the facts of this case and you look at every case that they cite for that proposition, none of them do that. None of them talk about a university's relationship with its adult students. And if you look at the out-of-state cases, for instance, the California case, you just have to read a little bit further. The California Regents case that they cite specifically talks about the limitations. That's why I was asking the questions about geographic limitations and university-sponsored limitations and others. It may well be true that the Washington Supreme Court will say, my God, the Attorney General is right. We would never go this far. My question is, why shouldn't we ask? Because the only reason to certify is if there's a question of Washington law or if there's an indication, and that the Supreme Court would decide differently because the Andrade case specifically says that the intermediate court is binding unless there's indication that the Supreme Court would decide differently. And there's no indication here from any of the cases... One last question at this point, then I'll let you sit down. Washington courts generally say they follow the restatement in areas of unsettled law. We have a new restatement. I'm not sure the new restatement is as dogmatic as your friend thinks it is. But why shouldn't we at least give the Washington Supreme Court the opportunity to consider it? Again, under the facts of this case, even the section 40, note L, of the restatement that talks about a special relationship, all you have to do is keep reading, Your Honor. You keep reading and it says, of course, this is limited to activities on campus or other activities of the university. So even if the Washington Supreme Court wholesale adopted the third restatement, it wouldn't matter in this case because it's specifically limited to on-campus events. I think we've taken you over. Let me make sure nobody else has questions for you. Mr. Talmadge, you've got a little bit of time for a vote. Thank you, Your Honor. If I can start you off. Certainly. We've gone back and forth about what your complaint is that they did or didn't do. Can you be any more specific about, let me state it, once he got to Pullman, should he have registered as a sex offender? Should he have worn an armband? What could or should they have done? He shouldn't have gone to Pullman, number one. That's the starting place. Earlier on, I thought you'd said the transfer without supervision was the problem. No, we said both. I mean, we said the transfer and the supervision. They should not have allowed him to transfer even if he had legal rights to do so? The argument that they assert that, oh, we can't let this, we can't limit the transfer of these people is nonsense. Okay. I'll take that as your argument. And let me follow up on that, Your Honor. Not just my personal opinion, but you have a whack that lays out the array of disciplinary authority that rests with the schools in connection with the conduct of students. It's amazingly detailed and diverse. This is a transfer that occurs while the disciplinary process is pending, right? And the disciplinary process is pending, which makes it even worse. But tell me where, tell me how they have the ability to limit somebody's transfer. I mean, you say they should have, and maybe I agree with you. They have the authority. The WAF certainly doesn't say. Your Honor, they have the admitted authority to put a transfer on hold. They can hold a transfer. They've admitted that they have that authority to do that. So you think they should have held the transfer while this was adjudicated? There was nothing in this record that suggests that Mr. Culhane was in Pullman for any reason other than attending Washington State University. No, I understand. I want to follow up on Judge Boggs's question. So let's assume they put a hold on this. Now, let's not worry about cause and fact, because I understand if he got there later, it wouldn't have happened on this day. But they put a hold on it, and then they finished the disciplinary proceedings. Why should one of the outcomes of the disciplinary proceedings be that you can never transfer? See, I understand the argument that the outcome should be you should be supervised. I understand your argument on that, but I'm still just having difficulty understanding why anything is furthered by telling them you must restrict your nefarious activities to the Vancouver campus rather than over you. In this case, you have an individual who's on the Vancouver campus who's engaged in one instance of sexual misconduct, and then involving one young woman, and then two more involving a second young woman. I understand all the things they know about him. I'm trying to figure out, other than the terribly unfortunate fact that at Pullman, he assaults your client, I'm trying to figure out why it makes any difference what campus he's on. Because you have an individual who's shown by his behavior that he's incapable. But suppose they denied the transfer, and he raped a woman on the Vancouver campus. They'd be here saying you should have let him transfer. Well, I don't know that that would be the case, Your Honor, but you put the fox among the hens. I mean, in effect, you allow just the predatory behavior to occur. Isn't that anything short of expelling him? Because otherwise, he's among some set of hens. Well, he's in a situation where he's a predator by behavior. They let him go to find new prey. In the briefs and in the record, there's a student who tells the university, letting him transfer to the Pullman campus is a bad idea, essentially because the Pullman campus is bigger. It's a residential campus versus Vancouver, which is smaller and a commuter campus. And essentially, it will be more difficult to supervise him. And there's evidence in the record that there's a significantly higher rate of sexual misconduct complaints at the Pullman campus. So is it your argument that any transfer at all would have been a breach in this case? Or specifically, a approval or failure to revoke or put a hold on a transfer to a campus where the likelihood, the incidence of sexual misconduct is, you know, a hundred and something per instead of, you know, eight incidents per year? They should have restricted his transfer. They should have supervised him when he got to Pullman, bottom line. And that was my starting question. And then we went off. Right. And I still come back to that. And so what supervision could they or should they have had? They should have made sure that he fulfilled the obligations that he had, but the limited sanctions that were imposed against him. He hadn't finished his alcohol treatment. He still didn't understand consent. Nine days before the rape of Madeline Barlow, he was telling the person at OSC, I don't understand what the concept of consent means. He's a predator who's allowed to pray. But his knowledge or his mental state is different from what they could have done about it. Is it that that should again have triggered no transfer or that should have triggered expulsion or should have triggered arrest? Well, it should have triggered additional supervision on the Pullman campus that he didn't have. He was under no particular supervision there. That's what I'm trying to get you to tell me. Yeah. What could that have been in the first four days of campus? I said, you want him to register as a sex offender? You want him to wear an armband? He should have been made aware that he had to understand what the concept of consent was. He should have finished his alcohol treatment, neither of which he did. Until that happened, he should have been barred from campus by the campus police? He should not have been allowed to transfer to that campus to undertake any of that. Yeah. Transfer and supervision upon transfer are both significant. This is an individual whose second victim, Ms. Ramirez, predicted, as Judge Sung points out, that he would engage in this very same kind of conduct at the Pullman campus if allowed to transfer. It's going to be their problem, which indeed he was. Now, if I could... No, you can't, because we've taken you over. So why don't you sum up? If I could, I was going to put it on the off-campus issues that the court had raised. We have pointed out in our reply brief at 15, note 8, there's very specific cases involving off-campus activities that are susceptible to liability under Washington law. And we've read them, and that's why we ask questions about... Certainly. ...what the relationship of this activity was to the campus. Certainly. And we would ask the court, under the circumstance, we believe that Ms. Barlow established a Title IX claim, and we believe as well that the court could appropriately certify this issue to the Washington Supreme Court about the special relationship. But last thing I would point out is, apart from any special relationship, in response to your question, Judge Hurwitz, what could the university have done? Put a person with a history of assaults in a class with other people and all of that? They had a separate freestanding Section 281 Restatement, Second Section 302B claim against such an individual that stands separate and apart from any special relationship. Like Perilla leaving the keys in the bus with a guy high on angel dust, it's no different than putting Mr. Culhane, who by history was a sexual predator, on the Pullman campus where he could engage in new predatory behavior. We ask the court to reverse.
judges: Boggs, HURWITZ, UNKNOWN